MANATT, PHELPS & PHILLIPS, LLP
CYNTHIA S. ARATO (CA 8350)
ALON MARKOWITZ (AM 0111)
7 Times Square
New York, New York 10036
Telephone: (212) 790-4500

Attorneys for Plaintiff Warner Bros. Records Inc.



**JUDGE CEDARBAUM**

**04 CV 9583**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WARNER BROS. RECORDS INC.,<br><br>Plaintiff,<br><br>-against-<br><br>THIRD POWER ENTERPRISES, INC., COLD CHILLIN' RECORDS AND VIDEO, INC., TYRONE WILLIAMS, AND JOHN DOES 1-60,<br><br>Defendants. | INDEX NO.  04 Civ. 9583<br>**ECF CASE**<br><br>**COMPLAINT** |

Plaintiff Warner Bros. Records Inc. ("WBR"), by its attorneys, Manatt, Phelps & Phillips, LLP, as and for its Complaint in this action, alleges as follows:

**Nature of the Action**

1.      WBR brings this action to prevent Defendants Third Power Enterprises, Inc. ("Third Power"), Cold Chillin' Records and Video, Inc. ("Cold Chillin'") and Tyrone Williams (collectively the "Named Defendants") from continuing their wholesale infringement of WBR's exclusive copyrights in and to sound recordings owned by WBR. Further, WBR brings this action to obtain a judicial declaration that it is the sole and exclusive owner of the copyrights in and to these works.

2.      In July, 1994, WBR and Defendant Cold Chillin' entered into an agreement (the "Limited Assignment Agreement") pursuant to which WBR assigned to Cold Chillin' for a

limited period of time only, until December 31, 2001, all copyrights in and to the sound recordings at issue, after which time the copyrights reverted back to WBR. Under paragraph 3(a) of the Limited Assignment Agreement, Cold Chillin' expressly represented and warranted that it "shall not exploit, nor shall [it] cause, license or otherwise authorize the exploitation of, any [of the sound recordings] beyond December 31, 2001." A copy of the Limited Assignment Agreement is annexed hereto as Exhibit A.

3.      Notwithstanding the Limited Assignment Agreement's express prohibition against Defendant Cold Chillin's licensing or exploitation of the sound recordings beyond December 31, 2001 and the express reversion of ownership of these works to WBR on January 1, 2002, the Named Defendants have refused to acknowledge that they no longer have any rights in these recordings and have continued to license, manufacture, sell and/or otherwise exploit these works from January 1, 2002 to the present. The Named Defendants' activities constitute a direct and flagrant violation of WBR's exclusive copyrights in each of these recordings.

4.      In order to remedy the Named Defendants' ongoing infringement and to prevent any continued infringement of the sound recordings, WBR seeks:  (a) a declaration that WBR is the owner of the copyrights in these works; (b) damages for the Named Defendants' willful infringement of WBR's copyrights in these works from January 1, 2002 to the present; (c) a permanent injunction prohibiting the Named Defendants from licensing, manufacturing, distributing, otherwise exploiting and/or holding themselves out as owners of these works in the future; and (d) recovery of WBR's attorneys' fees, costs and pre and post-judgment interest.

## The Parties

5.      Plaintiff WBR is a corporation organized and incorporated pursuant to the laws of the State of Delaware with a principal place of business at 3300 WBR Boulevard, Burbank, California. WBR owns the works at issue in this case.

6.      WBR is engaged in the business of the production, distribution, sale and exploitation of recorded music in the form of, among other things, compact discs, tapes, albums and audiovisual recordings.

7.      Defendant Cold Chillin', upon information and belief, was a corporation incorporated and organized under the laws of the State of New York with a principal place of business at 150 West 28th Street, New York, NY 10001. Upon information and belief, Cold Chillin' was dissolved on March 26, 1998.

8.      Defendant Third Power, upon information and belief, is a corporation incorporated and organized under the laws of the State of New York with a principal place of business at 207 Hermer Circle N.W., Atlanta, Georgia. Upon information and belief, Third Power was dissolved by proclamation on June 27, 2001. Third Power asserted through its attorneys in 2003 that it is the successor-in-interest to Cold Chillin' and, notwithstanding its apparent dissolution, the current owner of the works at issue.

9.      Defendant Tyrone Williams is, upon information and belief, an individual residing and doing business in the City, County and State of New York. Williams, upon information and belief, was and is a shareholder, director and/or officer of Defendants Cold Chillin' and Third Power who either (i) participated in, exercised control over and/or benefited from the infringement of these works by Cold Chillin' and Third Power and/or (ii) had the right and ability to supervise the infringement of the sound recordings at issue by Cold Chillin' and Third Power and had an obvious and direct interest in the exploitation of these copyrighted

-3-

materials. In addition, or alternatively, Williams, upon information and belief, (i) has or had succeeded to the control and/or ownership of the assets or purported assets of Cold Chillin' and Third Power as they pertain to the works at issue and/or (ii) has held or holds himself out as the copyright owner of such works and/or has exploited the same.

10.    The true names, identities and capacities, whether individual, associate, corporate or otherwise, of defendants DOES 1 to 10, inclusive, and each of them ("the DOE 1-10 defendants"), are unknown to WBR at this time, who therefore sues the DOE 1-10 defendants by such fictitious names. When the true names and capacities or participation of the DOE 1-10 defendants are ascertained, WBR will amend this complaint to assert their true names, identities and capacities. WBR is informed and believes and thereon alleges that each of the DOE 1-10 defendants sued herein (i) was or is a successor to the control and/or ownership of the assets or purported assets of Cold Chillin' and Third Power as they pertain to the works at issue and/or (ii) has held or holds himself, herself or itself out as the purported copyright owner of such works and/or has exploited the same. As a result, each of the DOE 1-10 defendants is responsible for the wrongful acts alleged herein, and is therefore liable to WBR in some manner for the events and happenings alleged in this complaint. WBR is informed and believes and thereon alleges that at all times herein mentioned, the DOE 1-10 defendants were and are doing business and/or residing in this District or are otherwise subject to the jurisdiction of this Court.

11.    The true names, identities and capacities, whether individual, associate, corporate or otherwise, of defendants DOES 11 to 30, inclusive, and each of them ("the DOE 11-30 defendants"), are unknown to WBR at this time, who therefore sues the DOE 11-30 defendants by such fictitious names. When the true names and capacities or participation of the DOE 11-30 defendants are ascertained, WBR will amend this complaint to assert their true names, identities

and capacities. WBR is informed and believes and thereon alleges that each of the DOE 11-30 defendants sued herein is a former or current shareholder, officer and/or director of Cold Chillin' and/or Third Power and/or the DOE 1-10 defendants who participated in, exercised control and supervision over and/or benefited financially from the infringement of the Warner Recordings by Cold Chillin' and/or Third Power and/or the DOE 1-10 defendants. As a result, each of the DOE 11-30 defendants is responsible for the wrongful acts alleged herein, and is therefore liable to WBR in some manner for the events and happenings alleged in this complaint. WBR is informed and believes and thereon alleges that at all times herein mentioned, the DOE 11-30 defendants were and are doing business and/or residing in this District or are otherwise subject to the jurisdiction of this Court.

12.     The true names, identities and capacities, whether individual, associate, corporate or otherwise, of defendants DOES 31 to 60, inclusive, and each of them ("the DOE 31-60 defendants"), are unknown to WBR at this time, who therefore sues the DOE 31-60 defendants by such fictitious names. When the true names and capacities or participation of the DOE 31-60 defendants are ascertained, WBR will amend this complaint to assert their true names, identities and capacities. WBR is informed and believes and thereon alleges that each of the DOE 31-60 defendants sued herein obtained a purported license from one of the Named Defendants, DOE 1-10 defendants and/or DOE 11-30 defendants to exploit and/or use the works at issue after December 31, 2001. As a result, each of the DOE 31-60 defendants is responsible for the wrongful acts alleged herein, and is therefore liable to WBR in some manner for the events and happenings alleged in this complaint. WBR is informed and believes and thereon alleges that at all times herein mentioned, the DOE 31-60 defendants were and are doing business and/or residing in this District or are otherwise subject to the jurisdiction of this Court.

## Jurisdiction and Venue

13.    This action arises under the Copyright Laws of the United States, 17 U.S.C. § 101 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

14.    This Court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this action involves claims arising under the United States Copyright Act.

15.    Upon information and belief, this Court has personal jurisdiction over Third Power, Cold Chillin', Tyrone Williams, DOE 1-10 defendants, DOE 11-30 defendants and DOE 31-60 defendants under the applicable provisions of the N.Y.C.P.L.R. because (i) Third Power and Cold Chillin' are corporations incorporated and organized under the laws of the State of New York and have conducted and/or solicited business in the State of New York, (ii) Williams resides in New York and/or has conducted and/or solicited business in the State of New York and (iii) the DOE 1-10 defendants, DOE 11-30 and DOE 31-60 defendants, upon information and belief, were and are doing business and/or residing in this District or are otherwise subject to the jurisdiction of this Court.

16.    Venue in this district is proper under 28 U.S.C. § 1391 because, upon information and belief, this is the district where all defendants reside and a substantial part of the events giving rise to the claim occurred in this venue.

## Background

### The Limited Assignment Agreement

17.    In the Limited Assignment Agreement, WBR assigned to Cold Chillin' for a limited period of time, until December 31, 2001, WBR's copyright interests in the sound recordings (the "Warner Recordings") and artwork (the "Artwork") featured on the albums listed in Exhibits A and B to the Limited Assignment Agreement.

-6-

18.    Specifically, in the Limited Assignment Agreement, WBR granted to Cold

Chillin' "for a seven and one-half (71/2) year period, commencing as of July 1, 1994, and ending

December 31, 2001 . . . an exclusive assignment of all sound recording copyrights, all other

right, title and interest, under statutory and common law, and otherwise, any and all tangible and

intangible rights and properties, and all causes of action relating thereto, to the extent that

[WBR] currently owns same, in and to the master recordings embodied in the phonorecords set

forth in Exhibit A attached hereto and incorporated herein by this reference (including, without

limitation, any derivative works of such master recordings that may not appear listed on such

Exhibit A)." Limited Assignment Agreement ¶1(a)(i).

19.    In addition, WBR granted to Cold Chillin' "for a seven (7) year period,

commencing as of January 1, 1995, and ending December 31, 2001 . . . an exclusive assignment

of all sound recording copyrights, all other right, title and interest, under statutory and common

law, and otherwise, any and all tangible and intangible rights and properties, and all causes of

action relating thereto, to the extent that [WBR] currently owns same, in and to the recordings

embodied in the phonorecords set forth in Exhibit B attached hereto and incorporated herein by

this reference (including, without limitation, any derivative works of such master recordings that

may not appear listed on such Exhibit B)." Limited Assignment Agreement ¶1(a)(ii).

20.    Further, in the Limited Assignment Agreement, WBR granted to Cold Chillin'

"for a seven and one-half (71/2) year period, commencing as of July 1, 1994, and ending

December 31, 2001 . . . an exclusive assignment of all copyrights, all other right, title and

interest, under statutory and common law, and otherwise, any and all tangible and intangible

rights and properties, and all causes of action relating thereto, (to the extent [WBR] currently

owns or controls same), in and to all Artwork owned, created and/or controlled by [WBR] and

previously used by [WBR] in connection with [its] commercial exploitation of the [Warner Recordings.]" Limited Assignment Agreement ¶1(b).

21.    Finally, under the Limited Assignment Agreement, Cold Chillin' expressly represented and warranted that it "shall not exploit, nor shall [it] cause, license or otherwise authorize the exploitation of, any [of the Warner Recordings] beyond December 31, 2001." Limited Assignment Agreement  ¶3(a).

### The Named Defendants' Post-2001 Claims to Ownership of Warner Recordings

22.    In or about approximately 2002, WBR learned that Tyrone Williams, Cold Chillin' and/or Third Power were holding themselves out as the owners of the Warner Recordings and, upon information and belief, were also continuing to license and exploit the Warner Recordings.  These Defendants were engaging in this conduct even though WBR's assignment of the Warner Recordings to Cold Chillin' had expired and WBR had not granted Cold Chillin' an assignment or license to exploit the Warner Recordings beyond December 31, 2001.

23.    Throughout 2003, WBR repeatedly informed representatives of Cold Chillin' and Third Power both orally and in writing that all rights in the Warner Recordings had reverted back to WBR.

24.    On February 20, 2003, Candis Johns of WBR sent Daniel Rubin, counsel for the Cold Chillin' and Third Power, a letter (the "February 20th Letter") reminding Mr. Rubin that the Warner Recordings "which were controlled by Cold Chillin'/3rd Power Enterprises Inc. for a limited period of time, have reverted back to WBR Bros. Records Inc. as of January 1, 2002." A copy of the February 20th Letter is annexed hereto as Exhibit B.

25.    In response to the February 20th Letter, Daniel Rubin sent Candis Johns a letter dated February 21, 2003 (the "February 21st Letter") stating that Mr. Rubin had "spoken with

Tyrone Williams [who] does not agree with your assertion that the Cold Chillin' Masters have reverted back to WBR Bros. Records, Inc." A copy of the February 21st Letter is annexed hereto as Exhibit C. According to Mr. Rubin, he had been instructed by Tyrone Williams to refer WBR "to [Mr. Williams'] attorney on this matter, William H. Ashborne."

26.     Accordingly, on March 12, 2003, Bob O'Neill, Vice President and General Counsel of WBR, sent a letter (the "March 12th Letter") to William Ashborne, the attorney for Defendant Williams, citing the relevant provisions of the Limited Assignment Agreement and directing Cold Chillin' to "immediately cease and desist" from licensing the Warner Recordings. A copy of the March 12th Letter is annexed hereto as Exhibit D.

27.     In response to WBR's demand that Defendants cease and desist from licensing the Warner Recordings, Daniel Rubin, counsel for Defendant Third Power, sent WBR a letter on July 21, 2003 (the "July 21st Letter") declaring that "Third Power Enterprises, Inc., as successor in interest to Cold Chillin' Records and Video, Inc. is the sole owner" of the Warner Recordings and demanding that WBR "immediately cease and desist any further licensing, manufacture, sale or any other exploitation of the [Warner Recordings.]" A copy of the July 21st Letter is annexed hereto as Exhibit E.

28.     On November 5, 2003, WBR's outside litigation counsel sent Daniel Rubin a letter (the "November 5th Letter") notifying the Named Defendants that their continued unauthorized use of the Warner Recordings would be "deemed knowing, willful and intentional" and demanding that the Named Defendants cease and desist exploitation of the Warner Recordings. A copy of the November 5th Letter is annexed hereto as Exhibit F.

29.     The Named Defendants and their representatives have never responded to the

November 5th Letter.  Upon information and belief, the Named Defendants continue to maintain

that they are the owners of the Warner Recordings.

30.     Moreover, upon information and belief, the Named Defendants and/or the DOE 1-

30 defendants have continued to exploit the Warner Recordings and to license the Warner

Recordings to third parties despite the fact that the Named Defendants do not own the copyrights

in and to these master recordings, and thus have no right to license them to others.  Upon

information and belief, these third parties are exploiting the Warner Recordings in violation of

WBR's rights.

**The Named Defendants' Infringing Activities Are Willful**

31.     The Named Defendants have been placed repeatedly on notice that they do not

own the Warner Recordings and have no right to exploit or license those recordings.  As

described above, WBR has sent the Named Defendants (and their representatives) several cease

and desist letters that provided the Named Defendants with explicit and repeated notice that

WBR owns the Warner Recordings, and that the Named Defendants' exploitation of those

recordings constitutes infringement of WBR's copyrights.

32.     Accordingly, the Named Defendants have systematically, knowingly, willfully

and intentionally infringed WBR's copyrights in the Warner Recordings.

**FIRST CLAIM FOR RELIEF**
(Declaratory Judgment Under 28 U.S.C. § 2201)

33.     WBR repeats and realleges each and every allegation contained in Paragraphs 1

through 32 of the Complaint as if fully set forth herein.

34.     WBR, either directly or through Reprise Records ("Reprise"), a division of WBR,

is the copyright owner of exclusive rights with respect to the Warner Recordings and/or the

Artwork. WBR, either directly or through Reprise, has applied for and/or received Certificates of Copyright Registration from the Register of Copyrights for the albums embodying the Warner Recordings and Artwork.

35.    WBR, which at all times after December 31, 2001, has been the sole lawful owner of all right, title and interest in the Warner Recordings and/or Artwork, contends that the Named Defendants and DOE 1-60 defendants (collectively "Defendants") may not use, license, distribute, manufacture and/or otherwise exploit the Warner Recordings and Artwork. WBR contends that such conduct by Defendants would constitute a deliberate and willful infringement of WBR's copyrights in and to the Warner Recordings and Artwork. In turn, the Named Defendants have contended that they are or Third Power is the sole lawful owner of all right, title and interest in the Warner Recordings and Artwork.

36.    An actual and bona fide controversy of a justiciable nature has arisen between WBR, on the one hand, and Defendants, on the other hand, as to who has the right to use and/or exploit the Warner Recordings and Artwork. If the activities of Defendants with respect to the Warner Recordings and Artwork are not declared unlawful, WBR will sustain substantial harm and injury as a result thereof.

37.    Accordingly, a judicial determination of the parties' rights and obligations with respect to the Warner Recordings and Artwork is required. WBR seeks a declaration from this Court that WBR owns the copyrights in the Warner Recordings and the Artwork and that Defendants' unauthorized exploitation of the Warner Recordings and Artwork willfully infringes WBR's copyrights in violation of the Copyright Act of the United States.

## SECOND CLAIM FOR RELIEF

(Willful Copyright Infringement against the Named Defendants and the DOE 1-10 defendants)

38.      WBR repeats and realleges each and every allegation contained in Paragraphs 1 through 37 of the Complaint as if fully set forth herein.

39.      Since January 1, 2002, WBR has been the exclusive owner of all right, title and interest in and to the Warner Recordings and Artwork.

40.      From January 1, 2002 to the present, the Named Defendants have maintained they are the owners of the Warner Recordings and Artwork. Moreover, upon information and belief, the Named Defendants have licensed, distributed, manufactured and/or otherwise exploited the Warner Recordings and Artwork. WBR has not, however, granted the Named Defendants a license or otherwise authorized the Named Defendants to exploit the Warner Recordings and Artwork for any time after December 31, 2001 (except as expressly set forth in the Limited Assignment Agreement), and, in fact, repeatedly has notified the Named Defendants that they were acting unlawfully and requested that the Named Defendants cease and desist from exploiting the Warner Recordings.

41.      Upon information and belief, the Named Defendants have acted, and continue to act, with the knowledge that WBR is the exclusive owner of the copyrights in and to the Warner Recordings and Artwork and the Named Defendants may not lawfully exploit these works as evidenced by the fact that the Named Defendants received repeated notices from WBR regarding the infringement.

42.      The Named Defendants' continued unauthorized use and exploitation of the Warner Recordings and Artwork constitute infringement and willful infringement of WBR's copyrights in and to the Warner Recordings and Artwork.

43.    WBR is informed and believes and thereon alleges that each of the DOE 1-10 defendants sued herein (i) was or is a successor to control and/or ownership of the assets or purported assets of Cold Chillin' and Third Power as they pertain to the Warner Recordings and Artwork and/or (ii) has held or holds himself, herself or itself out as the purported copyright owner of or has exploited the Warner Recordings and/or Artwork. The DOE 1-10 defendants' continued unauthorized use and exploitation of the Warner Recordings and Artwork constitute infringement and willful infringement of WBR's copyrights in and to the Warner Recordings and Artwork.

44.    As a direct and proximate result of the acts of copyright infringement by the Named Defendants and the DOE 1-10 defendants, WBR is entitled to damages and the profits of the Named Defendants and the DOE 1-10 defendants pursuant to 17 U.S.C. §504(b), or alternatively to the maximum statutory damages in the amount of $150,000 with respect to each of the Warner Recordings and Artwork pursuant to 17 U.S.C. § 504(c).

45.    WBR is additionally entitled to its attorney's fees and full costs pursuant to 17 U.S.C. §505.

46.    The conduct of Named Defendants and the DOE 1-10 defendants is causing, and, unless enjoined by this Court, will continue to cause Plaintiffs irreparable injury that cannot be fully compensated or measured in money damages. WBR has no adequate remedy at law and, pursuant to 17 U.S.C. § 502, is entitled to injunctive relief prohibiting the Named Defendants and the DOE 1-5 defendants from continuing their further use, sale, distribution, license and exploitation of the Warner Recordings and Artwork.

## THIRD CLAIM FOR RELIEF
(Contributory Copyright Infringement Against the Named Defendants and DOE 11-30
Defendants)

47.     WBR repeats and realleges each and every allegation contained in Paragraphs 1
through 46 of the Complaint as if fully set forth herein.

48.     As described above, upon information and belief, the Named Defendants
continued to engage after 2001 in the business of knowingly and systematically licensing to third
parties the right to use and exploit the Warner Recordings and Artwork.

49.     As described above, the DOE 11-30 defendants are former or current
shareholders, officers and/or directors of Cold Chillin and/or Third Power who participated in,
exercised control and supervision over and/or benefited financially from the infringement of the
Warner Recordings by Cold Chillin' and/or Third Power and/or the DOE 11-30 defendants.

50.     Through their conduct averred herein, the Named Defendants and the DOE 11-30
defendants, and each of them, have engaged and continue to engage in the business of knowingly
and systematically inducing, causing and materially contributing to the infringement of WBR's
copyrights and exclusive rights under copyright in the Warner Recordings and Artwork.

51.     The foregoing acts of contributory infringement by the Named Defendants and
the DOE 11-30 defendants have been willful, intentional and purposeful, in disregard of and
indifference to the rights of Plaintiffs.

52.     As a direct and proximate result of the acts of contributory infringement by the
Named Defendants and the DOE 11-30 defendants, WBR is entitled to damages and the profits
of the Named Defendants and the DOE 11-30 defendants pursuant to 17 U.S.C. §504(b), or
alternatively to statutory damages with respect to each of the Warner Recordings pursuant to 17
U.S.C. § 504(c).

53.     WBR is additionally entitled to its attorney's fees and full costs pursuant to 17 U.S.C. §505.

54.     The above-mentioned conduct by the Named Defendants and the DOE 11-30 defendants is causing, and, unless enjoined by this Court, will continue to cause WBR irreparable injury that cannot be fully compensated or measured in money damages. WBR has no adequate remedy at law and, pursuant to 17 U.S.C. § 502, is entitled to injunctive relief prohibiting the Named Defendants and the DOE 11-30 defendants from continuing contributorily to infringe WBR's rights in the Warner Recordings and Artwork.

## FOURTH CLAIM FOR RELIEF
### (Copyright Infringement Against Doe Defendants 30-60)

55.     WBR repeats and realleges each and every allegation contained in Paragraphs 1 through 54 of the Complaint as if fully set forth herein.

56.     Upon information and belief, the Named Defendants and/or the DOE 1-10 defendants have continued to exploit the Warner Recordings and Artwork and to license the Warner Recordings and Artwork to the DOE 30-60 defendants after December 31, 2001 despite the fact that the Named Defendants and the DOE 1-10 defendants do not own the copyrights in and to these works, and thus have no right to license them to others. The DOE 30-60 defendants are using the Warner Recordings and Artwork in violation of WBR's rights.

57.     The DOE 30-60 defendants' exploitation of the Warner Recordings and Artwork constitutes infringement of WBR's copyrights in and to the Warner Recordings and Artwork.

58.     As a direct and proximate result of the DOE 30-60 defendants' acts of copyright infringement, WBR is entitled to damages and the DOE 30-60 defendants' profits pursuant to 17 U.S.C. §504(b), or alternatively to statutory damages pursuant to 17 U.S.C. § 504(c).

59.     WBR is additionally entitled to its attorney's fees and full costs pursuant to 17 U.S.C. §505.

60.     The DOE 30-60 defendants' conduct is causing, and, unless enjoined by this Court, will continue to cause WBR irreparable injury that cannot be fully compensated or measured in money damages.  WBR has no adequate remedy at law and, pursuant to 17 U.S.C. § 502, is entitled to injunctive relief prohibiting the DOE 30-60 defendants from continuing their further use, sale, distribution, license and exploitation of the Warner Recordings and Artwork.

### Prayer for Relief

WHEREFORE, WBR demands judgment as follows:

A.      Declaring that WBR owns the copyrights in the Warner Recordings and Artwork and that Defendants' unauthorized exploitation of the Warner Recordings and Artwork willfully infringes WBR's copyrights in violation of the Copyright Act of the United States;

B.      Awarding WBR, at its election, either (i) actual damages and the profits derived by each of the Defendants as a result of Defendants' infringing activities, or (ii) statutory damages in the maximum amount permitted under applicable law;

C.      Permanently restraining and enjoining each of the Defendants, their officers, agents, servants and employees, and all persons in active concert and participation with them, from licensing, distributing, manufacturing or otherwise exploiting in any way, any of the Warner Recordings and Artwork or portion thereof, or otherwise infringing any of the Warner Recordings;

D.      Directing that each of the Defendants pay WBR the costs of this action and reasonable attorneys' fees herein;

E.     Awarding WBR pre-judgment and post-judgment interest on any

monetary award; and

F.     Granting WBR such other and further relief as the Court may deem just

and proper.

Dated: New York, New York.                    Respectfully submitted,
       December 6, 2004
                                              MANATT, PHELPS & PHILLIPS, LLP


                                              By:

                                                   Cynthia S. Arato (CA 8350)
                                                   Alon M. Markowitz (AM 0111)
                                                   7 Times Square
                                                   New York, NY  10036
                                                   (212) 790-4500


                                                   Attorneys for Plaintiffs
                                                   Warner Bros. Records Inc.


80303359.5

-17-

# Exhibit A

<u>ASSIGNMENT OF COPYRIGHT AGREEMENT</u>

THIS AGREEMENT is made as of the 1st day of July, 1994, by and between WARNER BROS. RECORDS INC., 3300 Warner Boulevard, Burbank, California 91505 Attn: Business Affairs Dept. (hereinafter called the "Assignor"), and COLD CHILLIN' RECORDS AND VIDEO INC., 150 West 28th Street, New York, New York 10001 (hereinafter called the "Assignee").

Reference is made to that certain agreement dated as of October 21, 1987, by and between Assignor and Assignee, as heretofore or hereafter amended, modified, extended or supplemented (the "Warner Bros./Cold Chillin' Agreement"). Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Warner Bros./Cold Chillin' Agreement.

1.    (a)    (i)    Subject to the terms and conditions of this agreement [including, without limitation, paragraph 1(d) below], as between Assignor and Assignee, Assignor hereby grants to Assignee for a seven and one-half (7-1/2) year period, commencing as of July 1, 1994, and ending December 31, 2001, for the Territory (as defined herein), an exclusive assignment of all sound recording copyrights, all other right, title and interest, under statutory or common law, and otherwise, any and all tangible and intangible rights and properties, and all causes of action relating thereto, to the extent that Assignor currently owns same, in and to the master recordings embodied in the phonorecords set forth in Exhibit A attached hereto and incorporated herein by this reference (including, without limitation, any derivative works of such master recordings that may not appear listed on such Exhibit A).

(ii)    Subject to the terms and conditions of this agreement [including, without limitation, paragraph 1(d) below], as between Assignor and Assignee, Assignor hereby grants to Assignee for a seven (7) year period, commencing as of January 1, 1995, and ending December 31, 2001, for the Territory, an exclusive assignment of all sound recording copyrights, all other right, title and interest, under statutory or common law, and otherwise, any and all tangible and intangible rights and properties, and all causes of action relating thereto, to the extent that Assignor currently owns same, in and to the master recordings embodied in the phonorecords set forth in Exhibit B attached hereto and incorporated herein by this reference (including, without

limitation, any derivative works of such master recordings that may not be listed on such Exhibit B). The master recordings set forth in Exhibit A and Exhibit B (including, without limitation, any derivative works thereof) are collectively herein referred to as the "Cold Chillin' Masters."

(b)  Subject to the terms and conditions of this agreement [including, without limitation, paragraph 1(d) below], as between Assignor and Assignee, Assignor hereby grants to Assignee for a seven and one-half (7-1/2) year period, commencing July 1, 1994 and expiring December 31, 2001, for the Territory, an exclusive assignment of all copyrights, all other right, title and interest, under statutory or common law, and otherwise, any and all tangible and intangible rights and properties, and all causes of action relating thereto, (to the extent Assignor currently owns or controls same) in and to all Artwork owned, created and/or controlled by Assignor and previously used by Assignor in connection with Assignor's commercial exploitation of the Cold Chillin' Masters under the Warner Bros./Cold Chillin' Agreement (the "Artwork"). Assignee hereby acknowledges and agrees that such exclusive assignment is subject to any restrictions imposed on such Artwork by the applicable creators of such Artwork (e.g., photographs, designers, illustrators, etc.). Assignee hereby warrants and agrees that all rights for the Territory in and to all Artwork assigned by Assignor to Assignee hereunder, including, without limitation, the Territory-wide copyrights therein and thereto, shall be protected and controlled by Assignee during the term hereof, and that Assignee shall (and shall cause Assignee's licensee[s]) to place in a visible manner the appropriate copyright notice in the name of Assignee in respect of all uses by (or all uses authorized by) Assignee of such Artwork. In connection with the foregoing, Assignee hereby agrees to indemnify and hold Assignor harmless in respect of any claims, demands or actions arising out of or in connection with any uses of the Artwork by Assignee (or its licensee[s]) of the Artwork which is inconsistent with the grant of rights hereunder or with the restrictions imposed on such Artwork by the creators thereof.

(c)  Notwithstanding anything to the contrary contained herein, Assignee hereby acknowledges and agrees that:

(i)  Assignor is not granting to Assignee hereunder any sound recording copyrights in or to (A) any master recordings embodying the featured performances of the artist p/k/a "Big Daddy Kane" that were delivered by Assignee to Assignor in satisfaction of the Recording Commitment under the terms of the Warner Bros./Cold Chillin' Agreement, nor (B)

any other master recordings which are not Cold Chillin'
Masters hereunder, but which embody the featured performances
of "Big Daddy Kane" and which Assignor may own the sound
recording copyrights therein and thereto or which Assignor may
otherwise have the right to exploit, but which were not
delivered in satisfaction of such Recording Commitment (e.g.,
third party soundtrack masters, third party duets, other
recordings, etc.); and

    (ii)  Notwithstanding anything to the contrary
contained herein, Assignee shall pay to Assignor as material
consideration for the rights hereunder assigned by Assignor to
Assignee a sum in the amount of One Hundred Thousand Dollars
($100,000), payable as follows:

        (A)  Assignee shall pay to Assignor for
Assignor's own account within thirty (30) days after
Assignee's receipt thereof one-half (1/2) of any and all
monies received by Assignee (or by any person or entity on
Assignee's behalf) in respect of any so-called master use
"sample" licenses regarding the Cold Chillin' Masters (or any
portion thereof) [i.e., Assignor shall receive Fifty Cents
($0.50) of every One Dollar ($1.00) of such so-called master
use "sample" license monies until One Hundred Thousand Dollars
($100,000) has been paid to Assignor for Assignor's own
account from payments received by Assignor pursuant to
paragraphs 1(c)(ii)(A) and 1(c)(ii)(B) hereof].  Assignee
shall authorize and instruct each and every so-called "sample
clearing house" with whom Assignee does business to provide to
Assignor, upon Assignor's demand, any and all information such
clearing house may have in its possession regarding so-called
master use "sample" licenses concerning the Cold Chillin'
Masters (including, without limitation, all information
regarding the license fees or other monies payable to Assignee
in respect of such sample licenses).

        (B)  Assignee shall pay to Assignor for
Assignor's own account within thirty (30) days after
Assignee's receipt thereof Ten Thousand Dollars ($10,000) of
the first monies of every advance or recording fund otherwise
payable by Sony Music Entertainment, Inc. ("Sony") to Assignee
(or to an entity or person on behalf of Assignee) in
connection with Assignee's recording and delivering to Sony an
album by a recording artist signed to Assignee's record
label(s) (presently, Cold Chillin' Records & Video, Inc.
[a/k/a and/or d/b/a "Living Large Records"]) pursuant to that
certain label agreement between Assignee and Sony dated
September 9, 1993 (as heretofore or hereafter modified,
amended, extended or supplemented).

        (C)  Assignee acknowledges that time is of the
essence in Assignee's payments to Assignor pursuant to this

paragraph 1(c)(ii), and Assignee's failure to make timely payments of all monies otherwise payable to Assignor pursuant to this paragraph 1(c)(ii) shall constitute, subject to paragraph 15 below, a material breech of this agreement.

(D)  Such payments shall continue until such time as Assignor notifies Assignee that Assignor has received a sum in the amount or in excess of the amount of One Hundred Thousand Dollars ($100,000), and any amounts in excess of One Hundred Thousand Dollars ($100,000) received by Assignor pursuant to this paragraph 1(c) shall be refunded to Assignee by Assignor within ninety (90) days after Assignor's receipt thereof.

(d)  Notwithstanding anything to the contrary contained herein, with respect to each Cold Chillin' Master for which the sound recording copyrights therein and thereto are assigned by Assignor to Assignee hereunder, Assignee hereby grants to Assignor a non-exclusive six (6) month so-called "sell-off" period with respect to Assignor's then-current inventory (including any returns received by Assignor prior to the end of such sell-off period) of the particular Cold Chillin' Master(s) concerned, with each such "sell-off" period to commence concurrently with the start of the particular assignment term for the Cold Chillin' Master concerned that is granted by Assignor to Assignee hereunder.

2.  Within sixty (60) days after the full execution hereof, Assignee shall record this exclusive assignment of sound recording copyrights and copyrights to the Artwork hereunder with the Registrar of Copyrights of the U.S. Copyright Office in accordance with the procedures and requirements of Title 17 of the United States Code (i.e., The Copyright Act of 1976), as amended.  In connection with the foregoing, Assignee hereby grants to Assignor a power of attorney, irrevocable and coupled with an interest, for Assignee and in Assignee's name, to record such exclusive assignment of such copyrights hereunder, which power of attorney may only be exercised if Assignee fails to properly record such copyright assignments as required by this paragraph 2.

3.  Notwithstanding anything to the contrary contained herein, Assignee hereby represents and warrants that:

(a)  Assignee shall not exploit, nor shall Assignee cause, license or otherwise authorize the exploitation of, any Cold Chillin' Master beyond December 31, 2001 (plus, solely for the purposes of this paragraph 3, the "Sell-Off Period" set forth in paragraph 16 below), nor allow, license or otherwise authorize more than three (3) Cold Chillin' Masters to be embodied in any one (1) third party compilation

phonorecord; provided, however, this paragraph is not intended, nor shall be construed, to prevent Assignee from licensing, in perpetuity, (i) so-called "samples" that are derived from any Cold Chillin' Master(s); (ii) synchronization rights in and to any particular Cold Chillin' Master(s) for a particular audio-visual work; provided, such audio-visual work is not a so-called "X," "XX," "XXX" or other similarly rated or unrated audio-visual work that is considered pornographic; and (iii) one (1) Cold Chillin' Master per third party compilation phonorecord; provided, however, in no event shall there be more than five (5) such third party compilation albums; and

(b)  Assignee shall license to Assignor and/or to Warner Bros. (i.e., the movie studio) in a timely manner so-called "free" or "gratis use" worldwide master use licenses (including, without limitation, so-called worldwide "sample" master use licenses) with respect to any Cold Chillin' Master for which such license is requested by either Assignor and/or Warner Bros.; provided, however, with respect to any so-called "synch" license(s) and/or so-called "sample" music publishing license(s) to be issued by Assignee pr Assignee's licensee(s) (i.e., foreign subpublisher[s]) in connection with the issuance of a master use license(s) for the Cold Chillin' Master(s) concerned, Assignee shall issue (or shall cause the issuance of) such worldwide "synch" license(s) and/or so-called worldwide "sample" music publishing license(s) in a timely manner at a rate and upon terms that are no less favorable, nor more onerous, than the then-current industry standard rates and terms for such "synch" licenses and/or so-called "sample" music publishing licenses used by the majority of so-called "major" music publishers in the country concerned for the issuance of such "synch" license(s) and/or so-called "sample" music publishing license(s), as applicable, for a similar or comparable use. With respect to any other Time Warner entity that requests the issuance of a master use license (including, without limitation, a so-called "sample" master use license), "synch" license and/or so-called "sample" music publishing license with respect to any Cold Chillin' Master, Assignee shall license (or cause the issuance of a license) to such Time Warner entity concerned in a timely manner the applicable worldwide license at a rate and upon terms that are no less favorable, nor more onerous, than the then-current so-called "major" music publishing and/or "major" record company, as applicable, industry standard rates and terms for such license concerned for a similar or comparable use that are used by the majority of the so-called "major" music publishers and "major" record companies, as applicable, in the country concerned for the issuance of such "synch," so-called "sample" music publishing and/or master use (including, without limitation, so-called "sample" master use) license, as applicable.

4.   (a)  In further material consideration of the rights herein granted, Assignee agrees to pay or cause to be paid to Assignor for Assignor's own account:

(i)  A per Cold Chillin' Master royalty that is the "penny rate" equivalent of three percent (3%) of the so-called "suggested retail list price" ("SRLP") in respect of net sales through normal retail channels in the United States of each phonorecord in any configuration that embodies a Cold Chillin' Master(s) ("U.S. Net Sales"), payable from the first record sold and prorated based on a fraction, the numerator of which is the number of Cold Chillin' Masters embodied in such phonorecord and the denominator of which is the aggregate number of royalty-bearing master recordings (including the Cold Chillin' Master[s]) embodied in such phonorecord.

(ii)  If Assignee is paid on a royalty basis, then, for all exploitation of the Cold Chillin' Masters other than U.S. Net Sales set forth in paragraph 4(a)(i) above, Assignor's royalties shall be calculated and otherwise determined in the same manner as Assignee's royalties with respect to the Cold Chillin' Master(s) concerned are calculated or otherwise determined under the terms of the relevant third party agreement governing the exploitation of such Cold Chillin' Master(s), shall be subject to the same deductions (e.g., for packaging charges and "Free Goods"), shall be computed upon the same base price, and shall be payable at the same times and in the same manner as Assignee's royalties.

(iii)  With respect to each particular method of exploitation of the Cold Chillin' Masters other than those set forth in paragraphs 4(a)(i) and 4(a)(ii) above, Assignor's royalty shall be calculated, prorated and/or reduced in the same manner as the royalty rate with respect to the applicable Cold Chillin' Master is prorated and/or reduced with respect to such method of exploitation under the terms and conditions of the relevant third party agreement governing the exploitation of such Cold Chillin' Master(s).  Notwithstanding anything to the contrary contained herein, if Assignee is paid on a net receipts or net royalties basis with respect to a particular method of exploitation of the Cold Chillin' Masters, then Assignor shall be paid a sum equal to twenty-five percent (25%) of the aggregate sum payable to Assignee with respect thereto.

(b)  In the event that Assignee enters into a third party agreement whereby such third party compensates Assignee on a basis other than the payment of royalties (e.g., a so-called "pressing and distribution" or similar type agreement), then Assignee shall cause such third party to pay directly to

Assignor for Assignor's own account for the applicable
territory an amount equal to Thirty Cents (U.S. 30¢) per unit.

(c)   With respect to each and every exploitation by
Assignee of the Cold Chillin' Masters, Assignee shall provide
to Assignor (or shall cause Assignee's licensee[s] to provide
to Assignor) a copy of the relevant terms and conditions of
the agreement (including, without limitation, any so-called
"sampling license agreement") regarding such method of
exploitation promptly after such agreement has been formally
executed or otherwise finalized.

5.   (a)   Payment of royalties or other monies by Assignee
to Assignor otherwise due and payable pursuant to paragraph 4
hereof shall be made semi-annually within ninety (90) days
following the end of each such semi-annual accounting period,
and each such payment shall be accompanied by statements
setting forth in detail the computation of the amount thereof.

(b)   Assignor shall have the right to inspect and
make extracts of the books and records of Assignee and of
Assignee's licensee(s) insofar as said books and record
pertain to the subject matter of this agreement.   Such
inspection shall be made on reasonable written notice during
normal business hours.   Assignor shall bear the cost of any
such inspection; provided, that if any such inspection(s)
reveals an error in the favor of Assignor in an amount in
excess of ten percent (10%) of the monies accounted for by
Assignee in respect of the period(s) so inspected, then
Assignee shall be solely responsible for and shall promptly
pay all costs incurred by Assignor in conducting such
inspection(s) (and all court costs and attorneys' fees, if
any) that are incurred by Assignor in connection therewith.

6.   Assignee hereby represents, warrants and agrees to
pay and to be solely responsible for payment of:

(a)   All recording artist and individual producer
royalties and all other third party payments that are in
addition to those provided in paragraphs 1(c), 4(a) and 4(b)
above and paragraphs 6(b) through 6(e) below.

(b)   All excise and other taxes for all records
manufactured and sold hereunder.

(c)   All payments to the AFTRA Pension and Welfare
Fund to the extent that Assignor may be additionally liable
therefor as a result of Assignee's exploitation, directly or
indirectly, of Cold Chillin' Masters pursuant to this
agreement, such monies to be paid directly to such Funds on
behalf of Assignor.

(d)   All copyright license fees, mechanical royalties or other fees payable to the copyright proprietors of all material embodied in each and every Cold Chillin' Master exploited hereunder.

(e)   All payments to the Music Performance Trust Fund, the Phonograph Record Manufacturers' Special Payments Fund or to any similar fund established by collective bargaining agreements required to be made as a result of sales made pursuant to or under this agreement, such monies to be paid directly by Assignee as signatory or on behalf of Assignor as signatory, whichever is applicable.

7.   Assignee agrees that during the term hereof all records embodying any Cold Chillin' Master(s) (or any portion thereof) as to which the sound recording copyrights therein and thereto have been exclusively assigned to Assignee by Assignor under this agreement shall bear in or on the packaging thereof, in a visible manner, a notice with respect to the Cold Chillin' Master concerned in substantially the form of the words:   "(P) [Date] Cold Chillin' Records," and all other copyright and other symbols or words which may be necessary to protect the sound recording copyrights exclusively assigned hereunder (including, without limitation, the reversionary rights of Assignor in and to the Cold Chillin' Master sound recording copyrights).

8.   In addition to Assignee's agreement to indemnify and hold harmless Assignor that is set forth in the last sentence of paragraph 1(b) above, Assignee hereby also agrees to defend, indemnify and hold Assignor harmless against any and all liability, loss, damage, cost or expense, including, without limitation, court costs and reasonable attorneys' fees, incurred by reason of any breach or claim of breach of any of Assignee's covenants, warranties, representations or agreements hereunder or by reason of and in respect of the distribution, manufacture, sale or other exploitation of the Cold Chillin' Masters by Assignee or Assignee's licensee(s) hereunder and not due to any violation or breach by Assignor of the covenants, warranties or representations hereunder. Assignee and/or Assignee's licensee(s) shall not settle any claim hereunder without Assignor's prior written approval, not to be unreasonably withheld.

9.   Assignor agrees to furnish to Assignee, at Assignee's request and expense, a magnetic or digital tape copy of each Cold Chillin' Master. At the time of delivery to Assignee of each such Cold Chillin' Master, Assignor shall supply to Assignee any information known to Assignor regarding copyrights and the names of the recording artists and other persons whose performances are embodied in the Cold Chillin' Master concerned.

10.   All Cold Chillin' Masters manufactured, distributed, sold or otherwise exploited by Assignee or Assignee's licensee(s) hereunder in the form of phonorecords in any configuration shall be released in phonorecords that utilize the highest quality materials that are reasonably and currently available and generally utilized by the majority of major phonograph record manufacturers in the United States for phonorecords in respect of the configuration concerned.

11.   Assignee hereby acknowledges and agrees that immediately upon the expiration or other termination of the term of this agreement all copyrights in and to the Cold Chillin' Masters and the Artwork, all other right, title and interest, under statutory or common law, and otherwise, any and all tangible and intangible rights and properties, and all causes of action relating thereto that have been exclusively assigned by Assignor to Assignee hereunder shall automatically revert to Assignor on an exclusive basis; upon such automatic exclusive reversion Assignor shall be deemed to have granted to Assignee the non-exclusive so-called "Sell-Off Period" set forth in paragraph 16 below.  In connection with such reversion, Assignee hereby agrees to fully cooperate with Assignor with respect to recording the reversion of the copyrights in and to the Cold Chillin' Masters and the Artwork with the Registrar of Copyrights of the U.S. Copyright Office in accordance with Title 17 of the United States Code, as amended; Assignee hereby grants to Assignor a power of attorney, irrevocable and coupled with an interest, for Assignee and in Assignee's name, to record such exclusive reversion of such copyrights, which power of attorney may only be exercised if Assignee fails to promptly execute and deliver to Assignor any document which Assignor may reasonably submit to Assignee for execution by Assignee in connection with the foregoing.

12.   Assignor hereby warrants, represents and agrees that Assignor has full right, power and authority to enter into and to perform this agreement.

13.   The "Territory" shall be the universe.

14.   All notices required hereunder or that either party desires to serve upon the other shall be in writing and shall be deemed given when addressed as set forth on page 1 hereof (or such other address as either party may designate in writing from time to time) and when delivered personally, with a receipt signed by a principal or officer of the deliveree; when deposited, postage prepaid, in the United States mail system (certified or registered mail, return receipt requested); when deposited, toll prepaid, in any telegraph office in the United States; or when transmitted via telex.

15. Assignor shall have the right to terminate this agreement if Assignee is in breach of any representation or warranty or material term or condition hereunder and Assignee does not cure such breach within thirty (30) days of receipt of Assignor's written notice of such breach; provided, that the foregoing shall not be applicable to any breach which cannot be cured.

16. In the event this license agreement shall terminate in accordance with paragraph 15 above or otherwise terminate or expire pursuant to the terms hereof, then Assignee (or its licensees) shall have the non-exclusive right to sell Assignee's (or its licensee's, as applicable) then-existing inventory of phonorecords embodying any portion of any Cold Chillin' Masters and all derivatives thereof for a period of six (6) months from the date of such termination or expiration (the "Sell-Off Period"). Assignee shall not manufacture, nor authorize the manufacture of, excess copies of phonorecords embodying any Cold Chillin' Master(s) (or any portion thereof) in anticipation of the Sell-Off Period. Within thirty (30) days after the close of the Sell-Off Period, Assignee shall destroy and/or shall cause Assignee's licensee(s) to destroy all such inventory (including, without limitation, any and all magnetic and/or digital tape copies of the Cold Chillin' Masters provided to Assignee by Assignor pursuant to paragraph 9 above) remaining at the close of the Sell-Off Period and, if requested by Assignor, shall supply to Assignor a sworn affidavit by Assignee (or by Assignee's licensee[s], as applicable) of such destruction.

17. Assignee shall not assign, sublicense or otherwise transfer or convey this Agreement, in toto, hereunder without the prior written consent of Assignor, and shall not pledge, mortgage or in any other way encumber this agreement or any Cold Chillin' Master (or any portion thereof) or any reproducing device derived therefrom or any Artwork in any manner whatsoever.

18. This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof and no modification, amendment, waiver, termination or discharge of any provisions hereof shall be binding upon either party unless confirmed by a written instrument executed by the party to be charged. No waiver of any provision of or default under this agreement shall affect the waiving party's right thereafter to enforce such provisions or to exercise any right or remedy in the event of any other default whether or not similar. This agreement has been entered into in the State of California and shall be construed in accordance with the laws of the State of California applicable to agreements made and to be wholly performed therein.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first above written.

WARNER BROS. RECORDS INC.
"Assignor"

By _____
         An Authorized Signatory

COLD CHILLIN' RECORDS
AND VIDEO INC.
"Assignee"

By _____
         An Authorized Signatory

ARTIST/TITLE: _____   RECORD NO.

## EXHIBIT A

**DIAMOND SHELL**

ALBUM:

"The Grand Imperial
Diamond Shell"                              26525

**THE GENIUS**

ALBUM:

"Words From The Genius"            26475

**GRAND DADDY I.U.**

ALBUM:

"Smooth Assassin'                       26341

**KID CAPRI**

ALBUM:

"Kid Capri: The Tape"             26474

**KOOL G RAP & D.J. POLO**

ALBUMS:

"Road To The Riches"              25820
"Wanted: Dead Or Alive"           26165

**MARLEY MARL**

ALBUMS:

"In Control, Volume 1"            25783
"In Control Volume II -
For Your Steering Pleasure"       26257

ARTIST/TITLE:                                    RECORD NO.

## EXHIBIT A

### MASTER ACE

ALBUM:

"Take A Look Around"                             26179

### NUBIAN M.O.B.

ALBUM:

"Nubian M.O.B."                                  26896

### M.C. SHAN

ALBUMS:

|                         |       |
|-------------------------|-------|
| "Down By Law"           | 25676 |
| "Born To Be Wild"       | 25797 |
| "Play it Again, Shan"   | 26155 |

### ROXANNE SHANTE

"Bad Sister"                                     25809

### 2 DEEP

ALBUM:

"Honey, That's Show Biz"                         26170

### VARIOUS ARTISTS:

ALBUM:

"2 Nasty 4 Radio"                                26441

ARTIST/TITLE: _____   RECORD NO.

## EXHIBIT B

### BIZ MARKIE

**ALBUMS:**

| | |
|---|---|
| "Goin' Off" | 25675 |
| "The Biz Never Sleeps" | 26003 |
| "I Need A Haircut" | 26648 |
| "All Samples Cleared" | 45261 |

### TBTBT

**ALBUM:**

| | |
|---|---|
| "Too Bad To Be True" | 45366 |

### T.C.F. CREW

**ALBUM:**

| | |
|---|---|
| "Come And Play With Me" | 45144 |

# Exhibit B



**WARNER**
STRATEGIC MARKETING

3400 West Olive Avenue, 4th Floor
Burbank, CA 91505
Phone: (818)238-6200
Licensing Fax:(818)562-9238

February 20, 2003

Daniel R. Rubin
Rubin, Weissman et. al.
o/b/o 3rd Power Enterprises Inc./Cold Chillin' Records
162 West 56th Street, Suite 306
New York, NY 10019
Sent via fax #: 212/707-8952

RE:    Cold Chillin' Repertoire Reversion

Dear Daniel:

Further to our conversation, as you are aware, the Cold Chillin' masters which were controlled by Cold Chillin'/ 3rd Power Enterprises Inc. for a limited period of time, have reverted back to Warner Bros. Records Inc. as of January 1, 2002. Please provide us with a list of any approvals with respect to Cold Chillin' material which you may have offered after losing rights on January 1, 2002, as we are making a claim on all those deals as infringements. Please fax this list to my attention by February 28th, with hard copy following via U.S. mail.

The foregoing is not intended to be a complete statement of the facts or of the law relevant to this matter, nor of our legal and equitable rights and remedies, and nothing hereinabove stated or omitted shall be deemed a waiver or limitation of any right, remedy or cause of action of any kind whatsoever, all of which are expressly reserved.

Regards,

Candis Johns
Manager, Domestic Licensing

CJ/jc

# Exhibit C

# Rubin & Weissman
## Attorneys at Law

162 West Fifty Sixth Street
Suite 306
New York, New York 10019

Daniel R. Rubin
Eric D. Weissman

Tel. (212) 707-8809
Fax. (212) 707-8952

Via Facsimile & Mail
February 21, 2003

Candis Johns
Warner Strategic Marketing
3400 West Olive Avenue, 4th Floor
Burbank, CA 91505

Re: Third Power Enterprises, Inc./Cold Chillin Records

Dear Candis:

Pursuant to our conversation of earlier this week, and further to your letter of yesterday, I have spoken to Tyrone Williams. Mr. Williams does not agree with your assertion that the Cold Chillin' Masters have reverted back to Warner Bros. Records Inc.

Mr. Williams has instructed me to refer you to his attorney on this matter, William H. Ashborne. Mr. Ashborne can be reached by telephone at (404) 696-5009, or by fax at (404) 505-9493.

Sincerely,

Daniel R. Rubin

cjohnsltr.1
cc:    Mr. Tyrone Williams
       William H. Ashborne, Esq.

# Exhibit D



**W|S|M**
Warner Strategic Marketing, Inc.
3400 W. Olive Ave., Burbank, CA 91505
Tel: (818) 238-6107 • Fax: (818) 562-9239

March 12, 2003

Mr. William H. Ashborne
BY FAX 404-505-9493

Dear Mr. Ashborne:

Daniel Rubin pursuant to instruction from your client, Tyrone Williams, has referred us
to you to discuss the reversion of the Cold Chillin' Masters to Warner Bros. Records Inc.
("WBR"). As you may know, WBR and Cold Chillin' Records and Video Inc. ("Cold
Chillin') entered into an Assignment of Copyright Agreement dated July 1, 1994, a copy
of which is enclosed ("Agreement") pursuant to which WBR assigned to Cold Chillin' its
interests in the masters listed on Exhibits A and B of the Agreement ("Masters")for a
term ending December 31, 2001.

I understand that Mr. Williams contends that notwithstanding the fact that December 31,
2001 has come and gone, Cold Chillin' still has certain rights to exploit the Masters. The
only provision of the Agreement which specifically addresses matters occurring beyond
December 31, 2001 is Section 3 which provides in part as follows:

> "Assignee shall not...license...any Cold Chillin' masters beyond December
> 31, 2001......; provided, however, this paragraph is not intended to prevent Assignee
> from licensing, in perpetuity...synchronization rights in and to any particular Cold
> Chillin' Master(s) for a particular audio-visual work..."

The purpose of this provision was to allow Cold Chillin' to enter into sample and synch
licenses during the Term, for licensing periods (i.e. perpetuity) which could extend
beyond December 31, 2001. That interpretation is consistent with the other provisions of
the Agreement, particularly section II which provides to the effect that immediately
following December 31, 2001, all of the rights in the Masters which had been assigned to
Cold Chillin' "shall automatically revert to Assignor on an exclusive basis".

In light of this language, Cold Chillin' has no right to continue to license the Masters and
we ask that it immediately cease and desist from doing so. We also ask that within
fifteen (15) business days from the date hereof, it delivers to us:

(a) a complete list of licenses of the Masters entered into by Cold Chillin' after
December 31, 2001, including contact information regarding the licensors, and;

(b) a written accounting for all revenues received from the licensing of the masters after December 31, 2001.

I am open to discussing this matter with the hope that we can resolve the issues raised by this letter amicably. To that end, you may call me at 818-238-6107.

This letter is written without prejudice to or waiver of our claims, rights and remedies, all of which are hereby expressly reserved.

Very truly yours,

Bob O'Neill
Vice President, General Counsel

BO:kms

# Exhibit E

**Rubin & Weissman**
**Attorneys at Law**

162 West Fifty Sixth Street
Suite 306
New York, New York 10019

Daniel R. Rubin
Eric D. Weissman

Tel.  (212) 707-8809
Fax. (212) 707-8952

Via Certified Mail
July 21, 2003

Bob O'Neil
Warner Strategic Marketing
3400 West Olive Avenue, 4th Floor
Burbank, CA 91505

Re: Third Power Enterprises, Inc./Cold Chillin Records

Dear Mr. O'Neil:

Further to my correspondence with Candis Johns this February, our client, Third Power Enterprises, Inc., the successor in interest to Cold Chillin' Records and Video, Inc. is the sole owner of certain master recordings (the "Masters") originally released on the Cold Chillin' Records label. This includes all recordings originally released by the Cold Chillin' label excluding all Big Daddy Kane master recordings.

This letter shall serve as formal notice to Warner Strategic Marketing, Warner Bros. Records, and any of its' affiliates to immediately cease and desist any further licensing, manufacture, sale or any other exploitation of the Masters. Furthermore, demand is hereby made that Warner Strategic Marketing provide our client with a complete list of records currently in distribution containing any of the Masters and any licenses granted to third parties concerning the Masters.

Please be advised that this letter is written without prejudice to any of the rights and/or remedies of our clients, all of which are hereby expressly reserved.

Sincerely,

Daniel R. Rubin

wspltr.1
cc:   Mr. Tyrone Williams

# Exhibit F

# PARCHER, HAYES & SNYDER

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

500 FIFTH AVENUE
NEW YORK, NEW YORK 10110

TELEPHONE
(212) 382-0200

E-MAIL
phs@phs-law.com

FACSIMILE
(212) 302-4371

November 5, 2003

**BY FACSIMILE AND FEDERAL EXPRESS**
(212) 707-8952

Daniel R. Rubin, Esq.
Rubin & Weissman
162 West 56th Street, Suite 306
New York, New York 10019

Re:    Warner Strategic Marketing, Inc./Third Power Enterprises, Inc. and "Cold
Chillin'" Records

Dear Mr. Rubin:

We are litigation counsel for Warner Strategic Marketing, Inc. ("WSM") and Warner
Bros. Records Inc. ("Warner Bros.")

We follow up on the prior correspondence and communications between Bob O'Neill and
your clients (and/or their representatives) regarding your clients' infringement of the "Cold
Chillin' Masters" (the "Masters"). As you are well aware, the documentary evidence is clear and
express: the Masters, which were assigned to your clients for a limited period of time, reverted
back to Warner Bros. Records as of January 1, 2002. (See Assignment of Copyright Agreement
dated July 1, 1994 by and between Warner Bros. and Cold Chillin' Records and Video, Inc. (the
"Agreement")).

Our clients notified your clients of this reversion by letters dated February 20, July 21 and
August 5, 2003. After providing only empty and conclusory denials of the reversion, your clients
have conjured up a series of ever-shifting explanations why the reversion, although provided for
by contract, allegedly did not take place. None have merit.

First, your clients apparently contended through William H. Ashbourne that some
unspecified provision of the Agreement allowed them to continue to exploit the Masters past the
reversion date. Next, a Mr. Greg Walker, an agent for Marlon Williams, told Barry Benson of
WSM that your clients allegedly obtained "full ownership" of the Masters through some sort of
"court settlement." Later, unable to support the "court settlement" theory, your client Tyrone
Williams then apparently claimed, through you, that, sometime after the Agreement was entered

PARCHER, HAYES & SNYDER, P.C.
Daniel R. Rubin, Esq.
November 5, 2003
Page 2

into, David Altschul had orally agreed to transfer the Masters to your clients outright, and with
no reversion to Warner Bros.  After Mr. Altschul denied this absurd allegation, and your clients
were forced to admit that no documentation supported it, your clients changed their story once
again.  Now they claim that it was Fred Brown, and not Mr. Altschul, who purportedly orally
agreed that your clients would own the Masters after January 1, 2002.  Mr. Brown's position is
the same as Mr. Altschul's:  he never agreed on behalf of Warner Bros., or anyone else, that your
clients would own the Masters after they reverted to Warner Bros. under the Agreement.

        Your clients' continued exploitation of the Masters constitutes clear copyright
infringement under the United States' Copyright Act.  Moreover, given your clients' ever-
shifting and, frankly, incredible, positions, we believe that your clients' unauthorized use of the
Masters will be deemed knowing, wilful and intentional, entitling our clients to significant
damages under the law.  Indeed, even under their own theories, the law is clear that your clients
cannot own the Masters.  To the contrary, it is black-letter law that a transfer of a copyright
interest must be in writing; oral agreements like the ones your clients claim to have been made
are simply invalid.  17 U.S.C. § 204(a).

        Accordingly, as an initial matter, we hereby demand that you confirm in writing that your
clients will:  (a) immediately cease and desist exploiting the Masters; and (b) destroy all copies of
the Masters which are currently in their or their representatives' possession.  In addition, we
hereby demand:  (1) a detailed accounting of the number of licenses granted and other uses of the
Masters; (2) a detailed accounting of all sales and revenues relating to the use of the Masters; and
(3) immediate payment of all receipts, gains, profits and advantages derived by your clients from
the aforesaid unlawful acts.

        In the event that we do not receive, by November 14, 2003, the above-described written
confirmation, our clients will conclude that all steps short of litigation have been exhausted.

        The foregoing does not constitute an exhaustive statement of the facts in this matter and
the demands made herein shall not waive or prejudice any legal or equitable rights or remedies
which our client may have in connection with the subject matter hereof, all of which are hereby
expressly reserved.

                                        Very truly yours,

                                        Cynthia S. Arato

cc:  Bob O'Neill, Esq.
CSA:aob